GUIDRY, Judge.
On August 5, 1986, defendant, John Anthony Sheehan, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, in connection with the shooting death of his wife. At the *671 time of the shooting, which occurred in the Parish of Avoyelles, John Sheehan was an enlisted member of the U.S. Air Force stationed at Eglin Air Force Base, Florida. Subsequent to his indictment, in connection with their own internal investigation and in cooperation with civilian authorities, the Air Force Office of Special Investigations (O.S.I.) caused a polygraph examination to be administered to Airman First Class Sheehan. The results of that examination, along with accompanying inculpatory statements, were turned over to the Avoyelles Parish Sheriffs Department. Defendant, by a motion to suppress which was heard and denied on October 31, 1986, sought to exclude certain inculpatory statements allegedly made to the O.S.I. officer who conducted the polygraph examination. On November 19, 1986, a jury of twelve, ten of whom concurred in the verdict, found the defendant guilty as charged. Defendant moved for a new trial. This motion, after hearing, was denied. Upon waiving all delays, defendant was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. Defendant now appeals his conviction based on the following four assignments of error:
1. Trial court erred in admitting statements made by the defendant and failing to suppress statements made by the defendant, and in denying the motion to suppress the said statements.
2. Trial court erred in that the evidence is insufficient to justify the verdict, and erred in failing to grant a new trial based on the insufficiency of the evidence.
3. Trial court erred in that the absence of the transcript prohibits the defendant from intelligently asserting his appellate rights, from properly perfecting assignments of error, and from briefing to this court the issue of sufficiency of the evidence required by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, and State v. Thetford, 445 So2d 128.
4. Trial court erred in failing to grant a new trial based on the defects in jury selection and the admissibility of inadmissible statements and opinions made by various witnesses.
Assignment of error number four was not briefed on appeal and is considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982). As we find merit to assignment of error number one, assignments of error numbered two and three will not be addressed.
FACTS
Defendant-appellant, John Anthony Shee-han, and the victim, Monica Jeansonne Sheehan, were married in Louisiana in May 1984, upon Monica’s graduation from high school. Following their marriage, the couple moved to Florida where the defendant was stationed with the U.S. Air Force. During the first year or so of their marriage, the couple had marital problems which resulted in bruises to Monica on several occasions and a hospital visit once. On one occasion, appellant allegedly said he hated her so much he could just kill her and slammed her against the wall. The couple received marriage counseling at the suggestion of John’s superiors and, according to defendant, they resolved their marital problems. Subsequently, on September 3, 1985, Monica gave birth to a son with the assistance of the appellant in the hospital as her “Lamaze Coach”.
The record reflects that in June 1984, a John Hancock agent solicited and sold defendant a $25,000.00 insurance policy on the life of Monica Sheehan. On April 17, 1986, the defendant sought additional insurance on the life of Monica Sheehan from the same agent, allegedly for the purpose of equalizing coverage for both spouses in light of his military insurance coverage. A policy of variable insurance with $50,000.00 coverage was taken insuring the life of Monica. Mrs. Sheehan was present during the negotiations and in the application stated no other insurance was pending or contemplated. Coverage was immediate through the execution of a military pay allotment form executed by the defendant. The following week, on April 23, 1986, defendant contacted a State Farm life insurance agent about obtaining additional insurance. At the State Farm office, appellant completed an application for a variable *672 life policy providing $75,000.00 coverage on the life of each spouse and $10,000.00 coverage on the life of the couple’s infant son. In the application, he stated no other applications for life insurance were pending with other companies. When the agent inquired as to when Monica could come in to sign the form and indicate her choice of final beneficiary, defendant explained it was difficult for his wife to come in and suggested he take the application home for her to complete. The agent agreed to this and the next morning defendant returned the completed form along with $88.00 in cash, putting the policy into effect immediately. The defendant signed Monica’s name on the application however, he made no attempt to duplicate Monica’s signature.
The victim and defendant traveled to Zachary, Louisiana, on April 29, 1986, where they spent the night at the victim’s mother’s house enroute to a wedding of one of Monica’s friends. The next morning they drove to Plaucheville, Avoyelles Parish, Louisiana, to the defendant’s grandparents’ home to visit. Sometime after their arrival, the defendant allegedly began to clean his grandfather’s shotgun, by wiping the exterior with an oily rag. The victim was seated, cross-legged, on the den floor playing a game when the shotgun discharged. She was struck in the upper left chest area with the pellets traveling in a sixty to seventy degree angle and exiting the middle of her back. The defendant’s grandmother, who was in the kitchen (the kitchen and den were separated by a bar rather than a wall) sent John to find his grandfather and telephoned for help. Mrs. Marks, the grandmother, was present when the ambulance arrived, but John did not return until afterwards.
The two nurses who responded to the call testified that they found the victim dead on the floor with two green unspent shotgun shells on the floor next to the body and a red spent shell several feet away. Detective Robert Venable of the Avoyelles Parish Sheriff's Deparment, who arrived at the scene sometime later, testified that he removed one spent red shell and one unspent red shell from the pump action shotgun. He found no spent shell on the floor, only the two green unspent shells. At trial, Mrs. Marks testified that there were four unspent green shotgun shells on the bar when the couple arrived and that the baby had played with two of them on the floor. She could not account for the whereabouts of the other two shells.
Detective Venable testified that, following Monica’s death, some members of her family contacted him to express suspicion of foul play and to relate the Sheehans’ history of marital discord. He stated that he also received a call from one of the non-commissioned officers who worked with the defendant at Eglin expressing concern that a person like John, who was very familiar with firearms, could be involved in such an accident. These expressions of suspicion and concern prompted further investigation by Venable. He testified that, during that investigation, he contacted the O.S.I. at Eglin Air Force Base where he spoke with Larry Brown and Agent Jerry Adams to request their cooperation. The O.S.I. agents agreed to cooperate and apparently began their own independent investigation in cooperation with the civilian authorities.
On August 5, 1986, defendant, John Sheehan, was indicted by a grand jury. On Thursday, August 14, 1986, he was arraigned in Marksville, Louisiana, and upon joint motion of the defense and the State, was granted permission to return to active duty at Eglin pending trial. That very same day, unknown to Sheehan, O.S.I. Special Agent Joseph H. Walker, U.S.A.F., contacted Detective Venable to inquire if the Avoyelles Parish Sheriff’s Office would have any objection to his administering a polygraph examination to Sheehan. Detective Venable informed Agent Walker that neither he nor his department objected to such an examination. Testifying at the motion to suppress, Detective Venable denied that any agreement was reached that the results of the examination or any statement secured by Agent Walker would be turned over to the civilian authorities, but Detective Venable did travel to Eglin Air Force Base on Monday, August 18, 1986, and was present in the O.S.I. building when *673 Sheehan was questioned and the test administered. At the hearing on the motion to suppress, Detective Venable testified as follows:
“Q. And I take it you were not present during the polygraph exam?
A. No I wasn’t.
Q. How long after ... or did you speak to Mr. Walker after the examination and subsequent interview of Mr. Sheehan?
A. Yes I did.
Q. And where did that conversation take place?
A. In the OSI detachment office at England [sic] Air Force Base.
Q. Did someone contact you and tell you that the interview was over and you could come over, or you should go over or something of that nature, or did you just show up?
A. I was already there.
Q. And you decided ... you were where on the base or on [sic] the building?
A. I was at England [sic] Air Force Base OSI detachment.
Q. And did you contact Mr. Walker or did he contact you after the interview?
A. He was there and we spoke.
Q. Who contacted whom?
A. Well I was in the room and he walked into the room.
Q. Alright and what was the nature of the conversation after that?
A. He didn’t have that much to say to me. He indicated that he couldn’t turn this over to me, that it would be turned over to Agent Adams, who in turn at his discretion turned it over to me since I had originally asked for a joint investigation.
Q. Mr. Walker told you he couldn’t turn it over, but he would give it to Mr. Adams and if Mr. Adams wanted to he could, is basically correct?
A. Basically correct.
Q. And Mr. Adams in fact did turn it over to you?
A. He did.
BY MR. JOHNSON:
Thank you very much detective.”
Airman First Class Sheehan was first summoned to the O.S.I. office at approximately 9:00 a.m., Monday, August 18,1986, under the guise that, because of his indictment in Louisiana, his security clearance was in danger of being revoked. Agent Walker described his first meeting with Sheehan as follows:
“A. I identified myself to him and told him I was a polygraph examiner and told him I was somewhat familiar with what had been alleged, that he may have been responsible for his wife [sic] shooting death, and I was there to give him a polygraph examination. If he was being truthful about the matter I could very easy [sic] clear him of it as far as the government would be concerned he would probably be able to retain his security clearence [sic], and they would remove any order of suspicion that might be within the Air Force at that time. After talking for twenty or thirty minutes he said he thought it would be a good idea, but he would like to talk to his attorney first.
Q. O.K. did he tell you who his attorney was?
A. Yes he did and he attempted to call his attorney that morning.”
Sheehan was unable to reach his attorney, Mike Johnson, at that time. He was told to keep trying and report back to Agent Walker at 11:00 a.m. Upon reporting back, Sheehan had been unable to reach his attorney and it was requested that further efforts be made. Shortly after 11:00 a.m., defendant finally reached his attorney, spoke with him, and then, pursuant to his attorney’s request, handed the telephone to Agent Walker. The record reflects the following colloquy between Agent Walker and defense counsel at the hearing on the motion to suppress:
“Q. Now, you indicated that you called me or he called and you got on the phone with me is that correct?
A. That’s correct.
Q. And I asked you ... tell me again what did I ask you exactly?
*674 A. I explained to you at first who I was and identified myself. That I was a polygraph examiner with the Air Force Office of Special Investigations, and that I would like to give Mr. Sheehan a polygraph examination.
Q. Did I ask you the purpose of that polygraph examination?
A. I don’t remember if you asked me or I volunteered it.
Q. That it was for his security clearance, is that correct?
A. Not security clearance, I told him his security clearance was being withdrawn because of the suspicion surrounding the facts of the shooting.
Q. Did I not ask you sir is this strictly internal for the military and you responded yes?
[[Image here]]
A. You asked me if I was working for the district attorney and I responded no.
Q. Or the sheriff’s office?
A. And I said no.
Q. And I said will any of this material be turned over to the civilian authorities, and you said no?
A. And I said ... that’s correct.
Q. But that proved not to be true huh?
A. Yes sir.”
Following their conversation, and based upon the assurance of Agent Walker that his client’s subjection to a polygraph examination was solely for military purposes and that nothing obtained as a result of the test would be turned over to the civil authorities, defendant’s counsel advised his client to proceed with the examination. At that point, Sheehan was given his rights under Article 31 of the Uniform Code of Military Justice which are similar to Miranda rights.
Agent Walker testified as follows concerning three questions he asked the defendant during the polygraph examination:
“A. I asked him did you look into the chamber of that shotgun before you began cleaning it, and he answered no. Did you load that shotgun before you started cleaning it, he answered no, and did you deliberately point that shotgun at Monica and he also answered no.”
At the conclusion of the polygraph examination, a conversation ensued between Agent Walker and Sheehan, which Agent Walker described as follows:
“BY MR. WALKER:
... I told Mr. Sheehan that I felt he was being untruthful about all three questions and at which point in time he requested to speak to his attorney.
Q. So at that time he wanted to talk to Mr. Johnson again, is. that correct?
A. That’s correct.
Q. Alright and what happened then?
A. I terminated my interview and allowed him to call Mr. Johnson.
Q. Did he call Mr. Johnson?
A. Yes he did.
Q. And did he speak with Mr. Johnson?
A. I know he called ... he said he called Mr. Johnson and when I saw that I felt he had Mr. Johnson on the line I stepped outside the room, so that he may have some privacy. After about four or five minutes he came outside and told me he had completed his conversation with Mr. Johnson and he was ready to proceed with any further testing or the interview.
Q. O.K. so then when he came back in and told you he was ready to proceed with the interview, could you tell us then whether or not then there was any further rights that was given to him at that time?
A. Not at that time.
Q. Alright then after the discussion was there any occasion then to take a statement from him? [written]
A. After about thirty minutes or so I did take a statement from him.”
Defendant was given his Miranda rights before the written statement was taken.
ASSIGNMENT OF ERROR NO. 1
Defendant claims that the statements he made to Air Force Special Agent Joseph Walker, O.S.I., which were admitted in evidence over objection, were involuntary in that they were made in reliance on false *675 promises and, therefore, appellant was denied his rights under the Fifth and Sixth Amendments to the United States Constitution. In support of his contention that the trial court erred in admitting these statements, the defendant relies on the promise made by Agent Walker to his counsel that nothing obtained as a result of the polygraph test would be turned over to the civilian authorities. We find merit in this contention.
"... [Cjourts are constitutionally bound to assure that those accused before our courts are tried in accordance with law and to reverse, where substantial error of law is committed.” State v. Butler, 322 So.2d 189 (La.1975). It is well settled that the rules governing the admissibility of inculpatory statements are the same as those which apply to the admissibility of confessions. State v. McGraw, 366 So.2d 1278 (La.1978); State v. Thompson, 399 So.2d 1161 (La.1981). Before a confession or inculpatory statement can be introduced into evidence, the state has the burden of affirmatively proving that it was freely and voluntarily given, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. C.Cr.P. art. 703(D); La. R.S. 15:451; State v. Thucos, 390 So.2d 1281 (La.1980); State v. Thompson, supra; State v. Vaccaro, 411 So.2d 415 (La.1982); State v. Green, 443 So.2d 531 (La.1983).
Clearly in the instant case, defendant’s statements were made based upon inducements and promises to both defendant and his attorney that “nothing” would be turned over to the civilian authorities. The record reflects that Agent Walker, as a member of the Air Force Office of Special Investigations, was working in concert with Detective Venable of the Avoyelles Parish Sheriffs Office. In our view, any misconduct on his part is akin to misconduct by any civilian law enforcement officer. It is logical to assume, based upon the record evidence, that if Agent Walker had revealed to defendant’s counsel that he and other agents of the O.S.I. were cooperating with the civilian authorities in the investigation of Monica Sheehan’s death and that, at that very moment a deputy from Avo-yelles Parish was waiting for any evidence the examination would provide, defense counsel would have advised his client not to take the polygraph and not to make any statements. We conclude that Agent Walker’s and Detective Venable’s actions clearly deprived the defendant of his rights under the Fifth and Sixth Amendments to the United States Constitution. For these reasons, we find that the trial court erred in denying defendant’s motion to suppress and in admitting, over objection, the incul-patory statements made by defendant to Agent Walker.
We next consider whether this error requires reversal of defendant’s conviction. To determine whether or not the error committed herein substantially affected the outcome of defendant’s trial or was harmless, we look to Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) wherein the U.S. Supreme Court stated “before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt”. This standard was adopted by the Louisiana Supreme Court in State v. Gibson, 391 So.2d 421 (La.1980). Additionally, La. C.Cr.P. art. 921 provides that “[a] judgment ... shall not be reversed ... because of any error ... which does not affect substantial rights of the accused”.
The record reveals that the guilty verdict was a 10 to 2 decision. Our review of the entire record does not enable us to determine what persuaded the jurors one way or another. The testimony at trial of Agent Walker covered approximately 20 pages of transcript and gave the appearance that the statements made by the defendant to him were freely and voluntarily given. The statements were inculpatory in that defendant allegedly admitted to Agent Walker that he knew there were shells in the gun while it was being cleaned and that while cleaning the gun, he pointed it at Monica, not to shoot her with it, but to line the shotgun up with her as she sat on the floor in front of him. We are unable to conclude that the testimony by Agent *676 Walker and the written statement admitted in conjunction therewith were harmless beyond a reasonable doubt. We find that there exists a more than reasonable doubt that such evidence may have contributed to Sheehan’s conviction, thus substantially affecting his rights.
Accordingly, for the reasons stated, the defendant’s conviction is reversed, his sentence is vacated and the case is remanded to the district court for a new trial excluding the oral and written statements given by Sheehan to Agent Walker and any testimony by Agent Walker concerning said statements or the events which took place August 18, 1986, at Eglin Air Force Base.
REVERSED AND REMANDED.