YELVERTON, Judge.
John Anthony Sheehan has been twice convicted by Avoyelles Parish juries of second-degree murder, a violation of La.R.S. 14:30.1, for the April 30, 1986, shooting death of his wife. On appeal from the first conviction this court reversed, 515 So.2d 670, because of a due process violation. In April 1988 Sheehan was again convicted, and it is from the second conviction that the present appeal is taken.
Defendant raises eight assignments of error. Two were expressly abandoned. Of the remaining six, the first involves sufficiency of the evidence to convict under the Jackson v. Virginia standard. The others are the alleged disqualification of a juror emanating from the juror’s responses on voir dire, alleged improper communications to the jurors during deliberations, denial of a motion to change venue, and the refusal of the trial court to permit a certain witness to testify on a remand to hear newly discovered evidence. We find that the evidence was sufficient to convict. We find that none of the remaining assignments of error have merit. We affirm the conviction.
ASSIGNMENT OF ERROR NO. 1:
This assignment relates to the sufficiency of the evidence. At the trial, the only disputed element of the offense of second-degree murder was whether the defendant had the specific intent to kill or inflict great bodily harm.
On April 30, 1986, defendant fatally shot his wife, Monica, with a 12-gauge pump shotgun. He was sitting in a chair holding the shotgun loaded with buckshot. It was pointed at his wife, who was sitting on the floor, when it fired. The victim sustained one shotgun blast in her heart.
Sheehan and his wife, along with their eight month old son, lived in Crestview, Florida. They came home to Louisiana for a visit in order to attend the wedding of one of Monica’s friends. The first night home they stayed with Monica’s mother in Zachary, Louisiana. The next morning they drove to Dupont. It was there, in the home of Sheehan’s grandparents, Robert *760 and Lillian Marks, that the shooting occurred.
Sheehan and Monica had been married less than two years. They had marital problems from the start. There was evidence of physical abuse. Monica was bruised several times and went to the hospital once. Sheehan told people that he did not love Monica and that he wished he had not married her. Monica’s stepfather testified that the defendant told him that he did not love the deceased and would do anything that it took to get her out of his life.
Shortly after the marriage, or nearly two years before Monica’s death, a John Hancock agent solicited and sold defendant a $25,000 insurance policy on Monica’s life. On April 17, 1986, thirteen days before his wife’s death, Sheehan solicited and obtained a $50,000 policy on Monica’s life from the same agent. This application stated that no other insurance was pending or contemplated. On the same day the defendant delivered a military allotment to the agent, making the $50,000 coverage effective immediately.
Six days later, on April 23, 1986, which was one week before Monica’s death, Shee-han contacted a State Farm Life Insurance agent about obtaining additional insurance on Monica’s life. An appointment was made for 4:30 p.m. the next day, April 24. At the State Farm office for the appointment, appellant completed an application for a variable life policy providing $75,000 coverage on the life of each spouse and $10,000 coverage on the life of the couple’s infant son. Sheehan took the application home with instructions to get his wife’s signature. Early the next morning, April 25, he brought the application back. It was signed with Monica’s name. He produced $88 in cash for the first two monthly premiums, in order to obtain immediate coverage. In the application, he stated no other applications for life insurance were pending with other companies.
It was stipulated at trial that defendant signed his wife’s name on the State Farm application. The defendant was named primary beneficiary on all policies on the life of his wife.
The defense in the case was that the defendant was cleaning the shotgun and the shooting occurred accidentally. The defendant allegedly began to clean the shotgun by wiping the exterior with an oily rag. The victim was seated, cross legged, on the den floor playing a game. The defendant’s grandmother, Mrs. Marks, was in the kitchen when the shotgun discharged.
There was expert testimony given at trial by a pathologist, based on trajectory calculations and the defendant’s version of the physical position of himself, the gun, and his wife, that the shooting could not have occurred the way the defendant said it did.
Right after the shooting, defendant’s grandmother ran from the kitchen into the den. She saw Monica lying on the floor and telephoned the operator for help. She also sent the defendant out to try to find some help and then she telephoned a nearby nursing home requesting assistance from that source. In response to this call two nurses and an ambulance driver arrived.
The two nurses testified that they found the victim dead on the floor. They saw on the floor two green unspent shotgun shells and a red spent shell near the body. The defendant did not return to the house until after the nurses got there.
Detective Robert Venable of the Avo-yelles Parish Sheriff’s Department arrived at the scene later. He testified that the only shells on the floor when he got there were the two green unspent shells. The weapon was on the sofa. He found and removed one spent red shell from the gun’s chamber and he found one unspent red shell in the magazine. He found no spent shell on the floor, only the two green unspent shells. Detective Venable testified that the weapon was a pump shotgun which required deliberate action to eject a fired shell from the barrel, and that moving the slide forward again takes a shell from the magazine and puts it in the chamber. The defendant was present in the room with the gun after the nurses left and before Detective Venable arrived. Mrs. Marks, defendant’s grandmother, testified *761 at trial that when the couple arrived that morning there were four unspent green shotgun shells on the bar (between the kitchen and the den), and that the baby had played with them and dropped two of the shells on the floor. According to the evidence the defendant was the only person who handled the gun.
The defense was that the killing was an accident, and that the evidence was insufficient to exclude every reasonable hypothesis of innocence. The defendant urges that the explanation that he was cleaning the gun and it went off is a reasonable hypothesis. For this hypothesis he argues that there was testimony that the defendant’s grandfather sometimes left the gun loaded. Defendant points to the facts that the insurance purchased did not provide for double indemnity, and that it was for whole life coverage rather than term. He argues the remoteness and insignificance of the marital problems as having a bearing on motive. A forensic scientist testified on defendant’s behalf offering an accident explanation of the shooting.
The disputed element of second-degree murder in this case is whether the defendant had a specific intent to kill or to inflict great bodily harm, as required by the statute defining the crime, La.R.S. 14:30.1, and the definition of specific criminal intent, in La.R.S. 14:10(1). Specific intent is a state of mind and need not be proven as fact, but may be inferred from the circumstances of the transactions and actions of the defendant. State v. Boyer, 406 So.2d 143 (La.1981). Specific intent is an ultimate legal conclusion to be resolved by the factfinder. State v. Graham, 420 So.2d 1126 (La.1982).
Because the state relied in large part on circumstantial evidence to convict, our standard of appellate review must comply not only with the familiar standard of Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), but also with La.R.S. 15:438, which requires that the proof must exclude every reasonable hypothesis of innocence. Proof of specific intent, and the exclusion of any reasonable hypothesis of innocence, could rationally and beyond a reasonable doubt be found in the circumstances of this offense: multiple purchases of insurance policies coincidentally with plans for a trip to Louisiana, the gun cleaning, the manipulation of shotgun shells, the medical probabilities. We find that a rational trier of fact, viewing all of the evidence in a light most favorable to the prosecution, could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded, and that there existed a specific intent to kill or inflict great bodily harm on the victim.
This assignment of error has no merit.
ASSIGNMENT OF ERROR NOS. 2 & 3:
These assignments claim error in failing to grant a new trial based on allegations that a juror gave false statements on voir dire. Defendant claims that these false statements prevented him from getting a fair trial, and amounted to a denial of his right to the intelligent exercise of peremptory challenges.
The juror was David Trimbur, the last one selected. Trimbur, an ordained Baptist minister for 25 years, was pastor of the Marksville Baptist Church, the parish seat in Avoyelles Parish, where the case was tried. His voir dire focused mainly on his status as a minister of religion. Following a relatively brief voir dire he was selected by both sides and sworn as a juror. During the voir dire it was revealed that he knew the district attorney, he knew Detective Venable of the Avoyelles Parish Sheriff’s Office, and he knew the two local defense attorneys, Tucker L. Melancon and Rodney M. Rabalais. In fact, Reverend Trimbur’s wife was employed by a firm owned by Tucker L. Melancon and his brother. He was asked specifically if his status as a well-known Baptist preacher in the area would affect his ability to serve on the jury, and he declared that it would not. His voir dire responses included statements that he knew nothing about the case, had talked to no one in the sheriff’s office about it and especially Detective Venable, and that he had no relationship with anyone involved that would keep him from being a fair and impartial juror. He was *762 asked three times — by the presiding judge, the district attorney and voir dire counsel for the defendant — whether there was anything that would keep him from being fair- and impartial, and he responded each time that there was not. On the subject of his acquaintance with Detective Venable, a witness in the case, he revealed that he had performed the marriage ceremony for Venable and his wife, and had seen them in his church from time to time, and also once or twice on a social basis. He explained, however, that he was not really that close to Venable, and again reiterated that this acquaintance would not prevent him from being a fair and impartial juror. As stated earlier, he was selected at the end of his brief voir dire by both .sides. He was the foreman of the jury.
After conviction, the defendant moved for a new trial, on the grounds that Reverend Trimbur had falsely answered questions on voir dire with respect generally to his relationship with the sheriffs department in Avoyelles Parish and specifically with respect to his relationship with Detective Venable. The trial court granted a hearing on the application for a new trial and testimony was adduced, including further testimony by Reverend Trimbur. On voir dire Reverend Trimbur had been asked, “Are you or any member of your family, or close friends, employed by the District Attorney’s Office, or by the Sheriffs Office?” To this he responded “No, sir.” At the new trial hearing counsel for defendant, noting that Reverend Trimbur had been for some time an auxiliary deputy with the sheriffs office, questioned him as to why he responded on voir dire that he was not employed by the sheriffs office. Reverend Trimbur explained that he had forgotten that once, back in 1987, he was paid thirty-eight dollars for a night when he sat with an inmate in a hospital. He said he had listened to the trial court’s instructions at the beginning of the voir dire informing the jury panel that a minister of religion could claim an exemption, as could a member of paid fire or police departments, and this instruction was fresh in his mind when he was asked whether he was employed by the sheriff’s office. He explained that his involvement with the department was minimal, and that he regarded himself and was looked upon there more as a chaplain than as a policeman. Since he accepted, for civic reasons, his responsibility to serve on the jury even though he had the right to claim an exemption on account of being a minister of religion, he attached no significance to the fact that he was an unpaid auxiliary deputy, and believed that if it was important, the attorneys would bring it up.
Following this hearing the trial court denied the motion for a new trial. On the subject of Reverend Trimbur’s “auxiliary” status, the trial judge in reasons for judgment said:
The factors which show him to be in the law enforcement community are that he had a uniform; he occasionally went on patrol with paid deputies; he had a badge; and he had a firearm. The factors which suggest that he was not truly a law officer are that he never made an arrest; he never interrogated a witness; he never used his firearm and never had firearm training; and he never participated in any investigation. While he did not have the title of chaplain, he considered his position to be essentially that. He counseled deputies; he counseled prisoners in the jail; he conducted prayer services when a deputy died in a plane crash.
The testimony of Rev. Trimbur depicts, in the court’s opinion, a very civic-minded individual who wanted to be a good citizen and to participate in civic activities. In voir dire by defendant’s counsel, when asked why he did not avail himself of his exemption as a minister, he answered as follows:
‘Because I’m not just a member or servant of my church; I’m a member of my community; and I feel strongly an obligation in my community.’
Concerning Reverend Trimbur’s relationship with Detective Venable, the trial court said:
It should also be pointed out that in spite of Trimbur’s testimony that he knew Detective Robert Venable, that he *763 had performed his marriage, and that he had talked to him the day before he was selected as a juror, the attorneys for the defendant nevertheless decided to accept him as a juror. It may be speculation to conclude that his service as an auxiliary deputy, especially considering his vocation and his activities in that capacity, would have resulted in a challenge either peremptorily or for cause.
The entire voir dire conducted by defense counsel with reference to Venable was as follows:
Q. Let me ask you some names and see if you know these folks.
A. Yes sir.
Q. Detective Robert Venable with the Sheriffs Office?
A. Yes sir.
Q. And how do you know Detective Venable?
A. I performed his wedding a year and a half ago.
Q. All right. And, did you have to— when I got married, I met with the preacher in advance, and he kind of counseled you and stuff, did you do any of that, or did you just do the ceremony?
A. I just did the ceremony.
Q. All right. Do you know his wife?
A. Yes, I did.
Q. Was she a member of your congregation, or he?
A. She was. That was in Evergreen.
Q. All right, have you had any contact with him since that time?
A. I saw him yesterday for a few minutes in the hall, and I asked him about his marriage.
Q. Other than that?
A. No sir. Not really.
The defendant now contends that Trim-bur was involved in giving extended marital advice to Venable contrary to what Trimbur indicated on voir dire. This was later denied by Trimbur and the record supports that denial. In fact, Trimbur was not even aware at the time of the trial that Venable and his wife were separated and living apart.
After the current appeal was taken, the defendant, alleging newly discovered evidence, moved for a remand to reopen proceedings on the motion for a new trial. In an affidavit attached to the motion for a remand, it was stated evidence had surfaced which would show that prior to trial Reverend Trimbur had sought advice from an attorney on how to answer questions if called as a potential juror, whether to disclose his status as an auxiliary deputy, and the possible consequences if it was known that he was an auxiliary deputy. The affidavit further declared that the newly discovered evidence would show that Reverend Trimbur made a conscious effort prior to trial to insure that he would serve on the jury and consciously avoided disclosure of information which was important to the defense.
At the hearing on remand regarding these serious allegations, Trimbur was again called to testify, as was Claire Sharp, an attorney in Marksville who was also a member of Trimbur’s congregation. An examination of their testimony reveals that it does nothing at all to support the allegations contained in the affidavit. On the contrary, their testimony emphasizes that Trimbur at all times demonstrated no more and no less than a citizen’s interest in his responsibility and duty respecting jury service. The trial judge again denied a new trial.
As was stated in State v. Ballard, 337 So.2d 481 (La.1976), there is no prohibition against jury service by an unpaid volunteer who peripherally and occasionally assists in law enforcement. Such service on a criminal jury, however, must be scrutinized closely. The same rules appear in State v. Chapman, 410 So.2d 689 (La.1982).
We have examined this record closely and find that there is nothing in it, nor in the nature of Trimbur’s function with the sheriff's office, which would disqualify him from service on the jury. It is apparent that he was a clergyman first, and an auxiliary deputy second. His responses on voir dire were not misleading, and did not conceal any information. His relationship to *764 the sheriffs office, as well as his relationship with Detective Venable, were not such as could be expected to destroy the otherwise impartial attitude of this juror. Trim-bur was subjected to intense interrogations in an effort to prove specific facts showing such a close connection to the sheriffs office and Detective Venable that bias for the prosecution should be presumed. Trim-bur’s consistent responses in the record reflect his voir dire commitment to fairness and impartiality. Nothing he said at the hearings supported a finding of bias, actual or implied. What comes across most strongly in the record of all three examinations — the voir dire, the new trial hearing, and the remand hearing — is his relationship with the community and its citizens in his capacity as a minister of religion. He neither sought nor avoided jury duty. He answered every question candidly and without rancor, openness characterizing his every response. Only by a strained manipulation of his words can bias be wrung from his testimony. We agree with the trial court.
We find no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 4:
By this assignment of error, defendant contends that knowledge that the defendant had been previously tried and convicted was obtained by one of the jurors and then passed on to the other jurors, and considered by them in their deliberations.
At the new trial hearing Terri Taylor, who was one of the two jurors who voted not guilty, testified that she heard about the first trial and conviction at a church service one night during the trial. She denied passing this information on to the other jurors, but she testified that she heard the matter discussed by other jurors during the trial. Because this testimony of Terri Taylor related to jury misconduct, and not as an unauthorized communication by a third person, the trial court sustained the state’s objection to her testimony.
At the time of trial, La.R.S. 15:470 (now repealed and replaced by La.C.E. art. 606) was the statutory law applicable. This statute read:
Art. 606. Disqualification of juror as witness
A. At the trial. A member of the jury may not testify as a witness before that jury in the trial of the case in which he is sitting as a juror. If he is called so to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.
B. Inquiry into validity of verdict or indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury’s attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
This statute has been found to preclude evidence of juror misconduct, but not to preclude evidence of misconduct of a third person. State v. Marchand, 362 So.2d 1090 (La.1978). If this testimony of Mrs. Taylor is treated as evidence of juror misconduct, it was inadmissible. If the testimony is treated as evidence of an unauthorized communication resulting from misconduct of a third person (at the church meeting), and therefore admissible, it nevertheless offended no substantial rights of the defendant, for two reasons: first, Mrs. Taylor testified that she did not pass the information on and, second, she voted for an acquittal.
This assignment of error has no merit.
ASSIGNMENT OF ERROR NO. 5:
This assignment complains of the failure to grant a change of venue. Defendant complains that a fair and impartial trial could not be obtained in Avoyelles *765 Parish because of the notoriety of the case including public knowledge of the first trial and the overturned conviction.
La.C.Cr.P. art. 622 provides the grounds for a change of venue as follows:
A" change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial.
At the hearing on the motion defendant called three witnesses. Dr. F.P. Bordelon testified that he was a witness at the first trial, and that he heard a lot of talk about the case then, but that he had not heard much about it since then: “Nobody has said anything in the last year that I know of....” The second witness was Marion Gremillion, editor of The Weekly News, the official journal of Avoyelles Parish. She was familiar with media coverage of the first trial. The coverage was basic type reporting. The third witness was Marc Zimmerman, a clinical psychologist. He conducted two polls to determine public awareness of the case and also to determine the ability to put aside knowledge of the case. Half of those polled knew nothing about the case. Thirty-five percent of those polled on the second question believed they could put aside whatever knowledge they had.
We agree with the trial court that the defendant failed to meet his burden of proof that a fair and impartial trial could not be obtained in Avoyelles Parish. This conclusion is further supported in the record by the ease with which a jury was selected. The voir dire was conducted as to each prospective juror individually, and a jury and an alternate were selected out of the first 46 jurors called for voir dire examination.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 8:
By this assignment of error, defendant contends that the trial court erred in refusing to allow him to call Tucker Melan-con, one of his two local attorneys in the case, as a witness at the hearing on remand.
The case was remanded, as pointed out earlier in a discussion of assignments of error Nos. 2 & 3, in order to hear defendant’s allegedly newly discovered evidence. The newly discovered evidence was set forth in an affidavit supporting the motion for a remand. The remand, necessarily, was limited to the scope of the newly discovered evidence as stated in the affidavit. The testimony of Melancon was not newly discovered evidence, had nothing to do with the matters asserted in the affidavit supporting the motion for a remand, and was properly excluded by the trial court. This assignment of error has no merit.
For the reasons explained herein, the conviction and sentence are affirmed.
AFFIRMED.