STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-521

STATE OF LOUISIANA

VERSUS

EDDIE RAY JACKSON, JR.

************

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, DOCKET NO. 334,030
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

************

SYLVIA R. COOKS
CHIEF JUDGE

************

Court composed of Sylvia R. Cooks, Chief Judge, John E. Conery and Charles G. Fitzgerald, Judges.

AFFIRMED.

J. Phillip Terrell, Jr., District Attorney
Catherine L. Davidson, Assistant District Attorney
Ninth Judicial District Court
P.O. Box 7538
Alexandria, LA  71306-7538
(318) 473-6650
COUNSEL FOR APPELLEE:
        State of Louisiana


Douglas Lee Harville
Louisiana Appellate Project
P.O. Box 52988
Shreveport, LA  71135-2988
(318) 222-1700
COUNSEL FOR DEFENDANT/APPELLANT:
        Eddie Ray Jackson, Jr.

**COOKS, Chief Judge**

**FACTS AND PROCEDURAL HISTORY**

On February 23, 2017, James Edward Melton, Sr., was sitting in his vehicle outside of a convenience store located at the intersection of Lee Street and Evergreen Street in Alexandria. Mr. Melton was waiting for Beatrice Papayanis. Two men approached Mr. Melton's vehicle. One of the individuals then pulled out a gun and shot Mr. Melton in the head while he was sitting in his vehicle, at which point both men took off.

On June 28, 2017, Defendant was charged by bill of indictment with one count of first degree murder, in violation of La.R.S. 14:30, and one count of armed robbery, in violation of La.R.S. 14:64. Following a pair of amendments in 2019, Defendant was ultimately charged with one count of second degree murder, in violation of La.R.S. 14:30.1, and one count of attempted armed robbery with a firearm, in violation of La.R.S. 14:27, 14:64, and 14:64.3.

On April 17, 2021, a jury trial was held. The State's first witness was Detective Chris Fonville of the Alexandria Police Department's Crime Scene Division, who was dispatched to process the crime scene. He identified the victim's blue truck which was at the scene, a number of photographs which showed blood on the headrest and top of the driver's seat in the victim's truck, and some twenty photographs taken during and after an autopsy was performed on the victim. Defense counsel voiced an objection to the gruesome nature of some of the State's Exhibits, specifically photographs showing the top of the victim's skull removed to show the trajectory of the bullet through the victim's brain.

Detective Fonville testified he was able to view and download footage of the shooting from the convenience store's camera system. The State then introduced video of the shooting taken by the store's security system from two different cameras. State's Exhibit 6 is a sixteen-minute-long security video which shows most

of the front of the convenience store where the shooting took place, as well as the side of the building where the victim parked his vehicle. The victim arrives and parks on the side of the store at roughly the 1:30 mark of the video. The victim never exits his truck. While the victim is sitting in his truck, three young black males can be seen walking to the convenience store from the neighborhood across the street. The three men are all wearing shorts and tennis shoes; one is wearing a dark hooded sweatshirt, one is wearing a plain white t-shirt, and the third is wearing a light-colored hooded sweatshirt. They walk past the victim and head to the front of the store where they remain without entering. Shortly after the 9:00 mark of the video, a young woman approaches the victim's truck from the same side of the street as the three men. She speaks to the victim for about ten seconds, during which time the two men wearing hooded sweatshirts both begin walking towards the victim's truck while the third male stands by the edge of the building.

After speaking with the victim, the female walks behind the victim's truck and heads into the store, passing the two males in hooded sweatshirts in the process. As the two men calmly walk towards the victim's driver-side window, the individual in the dark sweatshirt jumps towards to the window. After roughly ten seconds of interaction between the victim and the man in the dark sweatshirt, during which time the individual in the light sweatshirt has his back to the vehicle, the two men walk away from the truck. Once the two men reach the road, they take off running back to the neighborhood across the street from which they initially came. The individual in the white t-shirt disappears from the camera seconds thereafter. The female exits the store at roughly the 12:00 minute mark of the video, lights a cigarette while speaking to someone who came out of the store with her, then walks back to the victim's truck and sticks her head in the passenger-side window. She then calmly walks away from the truck. No one else approaches the victim's vehicle until law enforcement arrives approximately four minutes later.

3

State's Exhibit 7 is video of the front side of the convenience store from a camera above the ice machine by the front door during the same sixteen-minute time frame. Between the 7:05 and 7:10 marks of the video, the individual in the dark sweatshirt is almost directly under the camera while facing towards it; a comparison with Defendant's mug shot photo confirms that Defendant is the individual wearing the dark sweatshirt. As noted with the prior video, the three individuals spend around three minutes just standing around outside the front of the store without entering. The individuals disappear from view at the 9:15 mark with the individual in the white t-shirt reappearing at roughly the 9:40 mark. The young woman then walks past and enters the store at the 9:48 mark. The individual in the white t-shirt continues to pace in front of the store before walking around the corner on the opposite side of the store from the victim's vehicle at the 11:00 mark. The young woman exits the store at roughly the 12:00 mark and disappears from view shortly thereafter.

The State then called Detective Torrence Bowens who was assigned as the lead detective in the murder of James Melton. Detective Bowens testified that when he arrived there was a uniformed officer and Acadian Ambulance on site, that neither of the clerks inside the store was aware a shooting had occurred in the parking lot, and that he reviewed the security camera footage. According to Detective Bowens, his conversations with witnesses led him to the home of Ms. Geraldine Hampton, where he was looking for Ms. Beatrice Papayanis. Detective Bowens stated he knew Ms. Hampton and Ms. Papayanis were related and noted Ms. Hampton's home was approximately a block and a half away from the convenience store.

According to Detective Bowens, Ms. Papayanis arrived at Alexandria Police Department headquarters shortly after Detective Bowens returned from the crime scene, accompanied by Nicholas West. Ms. Hampton then soon arrived with her son, Joseph Hampton. While unsure when Defendant arrived at headquarters,

4

Detective Bowens noted Defendant was interviewed about two hours after the start of Ms. Papayanis's interview. Detective Bowens testified he personally interviewed Defendant and that Defendant waived his rights prior to the interview.

The State introduced both an audio recording of Defendant's statement and a transcript of the conversation which was just over three pages long and consisted of Defendant saying he was walking with Joseph Hampton when they heard a gunshot, saw a dead body, and went home. Detective Bowens then commented on the video of the shooting as depicted in State's Exhibit 6, noting that when Mr. Melton is shot, the individual in the light sweatshirt is "[w]alking away with his back turned." Detective Bowens stated at that point he arrested Defendant and Mr. West.

On cross-examination, Detective Bowens testified that other individuals were brought to headquarters but no one else was arrested and that no gunshot residue tests were done in the instant case. He testified he was unaware of anything being taken from Mr. Melton. He noted that, at the time of the shooting, Defendant was seventeen, Mr. West was twenty, Mr. Hampton was eighteen, and Ms. Papayanis was twenty-five years of age.

The State then called Ms. Sonya Wiley-Gremillion, the custodian of records for 9-1-1 calls in Rapides Parish. Ms. Wiley-Gremillion identified State's Exhibit 13 as a disc containing six 9-1-1 calls related to the shooting of Mr. Melton, the first of which was recorded at 11:46 a.m. on February 23, 2017. She also identified State's Exhibit 15, a disc containing a 9-1-1 call received at 12:15 p.m. on February 23, 2017. The call was from Ms. Papayanis, who claimed she ran away from the scene after she knocked on the victim's window and he did not respond despite breathing heavily. She stated she knew the shooter's identity but did not give the name over the phone.

The State called Mr. Christopher Winchester, the individual who placed the initial 9-1-1 call to report the shooting of Mr. Melton. Mr. Winchester testified that

he was parked at an abandoned building on Evergreen Street, directly across from the convenience store, eating his lunch in his truck. According to Mr. Winchester, a young lady who "was kind of short with long hair" walked past the side of his truck heading towards the convenience store. He noted the young lady approached the truck parked on the side of the store, spoke to the driver, and "made a hand transaction" before heading into the store. Mr. Winchester testified the young lady passed two gentlemen as she walked around the back of the truck, noting the two men walked up to the driver's window. According to Mr. Winchester, he looked down at his phone and heard a "pop." When he looked up, he saw a dark-skinned male in a black top with basketball shorts on put a gun in his right pocket before both men took off running. Mr. Winchester viewed State's Exhibit 6 and confirmed the individual wearing the dark hooded sweatshirt was the one he saw put a gun back into his pocket before running away.

The State then called Mr. Joseph Hampton, III, who testified he is Defendant's cousin. Mr. Hampton testified that prior to the shooting, he and Defendant would spend around two days a week together. According to Mr. Hampton, on the morning of February 23, 2017, he was at his mother's home on Felker Street with his cousin Jasmine, his brother Gerald, Defendant, Nicholas West, Beatrice Papayanis, and one of Jasmine's friends. He noted the family refers to Defendant as "Jay." According to Mr. Hampton, he, Defendant, and Nicholas West all left the house together to walk to the store on the corner of Lee and Evergreen. Viewing State's Exhibit 6, Mr. Hampton identified himself as the member of the three young males in the white t-shirt, Defendant as "the one with the black hood on," and Mr. West as "the one in the tan jacket." He testified he did not have a firearm that day and he was unaware if either of the other two men had a firearm.

Mr. Hampton specifically testified he saw Defendant shoot the man in the truck before both Mr. West and Defendant took off running. Mr. Hampton testified

he waited briefly for Ms. Papayanis, his aunt, to come back outside but ultimately chose to go home because he was nervous and did not know what to do. He stated that when he arrived home, his brother Gerald, his cousin Jasmine, one of Jasmine's friends and the friend's little sister, and Defendant were all present; he did not see Ms. Papayanis or Mr. West at the house. Mr. Hampton testified his Uncle David brought him and Defendant to meet Mr. Hampton's mother, who then tried to bring both young men to the police department. According to Mr. Hampton, Defendant got out of the car before they got to the police department.

On cross-examination, Mr. Hampton stated he saw the gun fire then saw Defendant and Mr. West run away. Mr. Hampton also testified he was unaware of any relationship between Ms. Papayanis and Mr. Melton or that Defendant and Mr. West were planning to confront Mr. Melton, stating he only knew his aunt was going to get him some cigarettes at the store.

The State then called Ms. Geraldine Hampton, Joseph Hampton's mother. In reference to the home on Felker Street, Ms. Hampton testified she lived there part-time depending on her work schedule. She testified, however, that her sister Deisha Austin, her brother, cousin, and her children lived at the house full-time. She noted that she was at the house on Felker daily; however, she did not sleep at the house on the morning of February 23, 2017. She testified she went to the house on Felker Street around 8:00 a.m. and stated the following people were at the home: her children Miranda, Joseph, and Gerald; her sister Deisha; her cousin David; her nephew Eddie Ray Jackson; Ms. Papayanis; Mr. West; and a neighbor. Ms. Hampton testified that her ex-husband was Defendant's mother's brother. On February 23, 2017, Ms. Hampton brought her daughter to work then went to work herself in Pineville, Louisiana.

According to Ms. Hampton, her son Joseph called her around noon, and she left work and met her cousin David at an Auto Zone near the house to bring Mr.

Hampton and Defendant to the police station. She testified she tried calling Defendant's mother, Ms. Betty Hampton, to let her know Defendant had been involved with a shooting. Ms. Geraldine Hampton testified she was bringing Joseph and Defendant to the Bolton Street Police Department, but Defendant got out of the car before she got there. Viewing State's Exhibit 7, Ms. Hampton identified Defendant as the individual in the dark hooded sweatshirt.

On cross-examination, Ms. Hampton identified her son as the individual in the white t-shirt in the videos, Mr. West as the individual in the tan sweatshirt, and Defendant as the individual in the dark sweatshirt. She confirmed that, looking at the individual in the dark sweatshirt's face in the video, she was completely confident it was Defendant. Ms. Hampton noted Mr. West was dating Ms. Hampton's sister, Ms. Papayanis, who was six or seven years older than Mr. West. She also acknowledged knowing Defendant and Ms. Papayanis had previously had a sexual relationship.

The State's final witness was Mr. Nicholas West. Mr. West testified that in the instant case he had received a ten-year sentence for obstruction of justice in exchange for his truthful testimony. Mr. West testified that he was at Geraldine Hampton's house on Felker Street on the morning of February 23, 2017, until he, Defendant, and Joseph Hampton went to the store around 11:30 a.m. Viewing State's Exhibit 7, Mr. West identified himself as wearing a "tan hoodie" in the video. Mr. West identified Defendant as the individual in the dark sweatshirt and Mr. Hampton as the other individual. According to Mr. West, while he was standing with his back to Mr. Melton's vehicle, Defendant told Mr. Melton to "[g]ive up the money," at which point Mr. West heard a gunshot and started to walk away. Mr. West testified there was very little time between Defendant telling Mr. Melton to give up his money and the gunshot.

According to Mr. West, both he and Defendant then ran back to the house on Felker Street, where Mr. West changed his jacket then left with Ms. Papayanis once she returned to the home. He testified they left the house and went to the mall.

On cross-examination, Mr. West testified that at the time of the shooting he and Ms. Papayanis had been dating for two or three months and were living together at the house on Felker Street. He testified he went to the store to get cigarettes but did not enter because he was waiting for Ms. Papayanis to come actually buy cigarettes. Mr. West testified Ms. Papayanis was friends with Mr. Melton and she was going to get money from him to buy the cigarettes. Mr. West denied planning an attack on Mr. Melton and testified he took a plea deal for ten years on obstructing justice because his attorney advised him it was in his best interests. He acknowledged that he knew Defendant and Ms. Papayanis had previously been in a relationship. The State rested its case at that point.

The defense called Ms. Beatrice Papayanis. Ms. Papayanis testified she had met Mr. Melton on a dating website. She testified that she was at Ms. Geraldine Hampton's house on the morning of February 23, 2017. Ms. Papayanis testified she went to the convenience store to meet Mr. Melton but Defendant, Mr. Hampton, and Mr. West had already left the house when she departed for the store. She testified she was going to buy cigarettes for Mr. Hampton and Mr. West and that Mr. Melton was going to bring her to Wal-Mart to get Rotel dip. She stated Mr. Melton helped her by giving her food and change for her and her son "[w]ith nothing asked for in return."

Ms. Papayanis admitted that she had offered to have oral sex with Mr. Melton in a text message but claimed nothing sexual ever happened between them. She testified that Mr. West knew about her friendship with Mr. Melton but not that Ms. Papayanis had offered to give him sexual favors. According to Ms. Papayanis, Defendant may have been upset when their sexual relationship ended, stating "he

was kind of abusive." Ms. Papayanis testified Mr. Melton gave her about five dollars in change to get something from the store when she arrived, claiming he was going to cash his check when they went to Wal-Mart to get her some groceries. She testified she passed Defendant and saw Mr. Hampton and Mr. West when she was going into the store but that she had no idea what they were doing. Ms. Papayanis testified she asked Mr. Melton to meet her at the store because she was concerned there were a lot of people around and she was worried about Mr. Melton's safety due to his race.

Ms. Papayanis testified a man was talking to her when she exited the store. She testified she then walked up to the victim's passenger side to get into the truck, but it was locked. Mr. Melton did not respond when she knocked on the window, at which point she noticed the hole in the back of his head. Ms. Papayanis testified she was in shock and that she backed away from the vehicle, took out her phone, and called 9-1-1. Ms. Papayanis claimed she was on the phone with 9-1-1 as she returned to the house at Felker Street and when she saw Defendant she got scared and left while still on the phone with law enforcement.[1] Ms. Papayanis testified she returned to the house on Felker because she was worried that Mr. West and Defendant had gotten into an altercation and had accidentally killed Mr. Melton while shooting at each other.

The defense then called Defendant's mother, Ms. Betty Hampton.[2] According to Ms. Betty, she was in bed due to her hypothyroidism when she got a phone call from Geraldine Hampton on February 23, 2017. She testified Defendant was down the street from her house getting a haircut, so she picked him up and brought him to

[1] We note this part of Ms. Papayanis's story does not match the actual 9-1-1 call she made thirty minutes after the shooting, when she was in the Burlington Coat Factory parking lot at the mall and told law enforcement the shooter was at the same house where she lived without ever telling them who the shooter was.

[2] We will refer to Defendant's mother as "Ms. Betty" to avoid confusion between Ms. Betty Hampton and Ms. Geraldine Hampton.

the police station. She testified that her house was about a ten-minute drive from the convenience store where the shooting took place. According to Ms. Betty, Ms. Hampton called her at 1:30 p.m. to tell her about the shooting.

On cross-examination, Ms. Betty admitted she did not see Defendant on the day of the shooting before Ms. Hampton called her. She subsequently clarified that the first time she saw Defendant on the day of the shooting was around 2:00 p.m.

The defense then called Mr. Jeremy Williams, Defendant's barber from 2017. Mr. Williams testified he cut Defendant's hair on the day of the shooting but could not state what time the haircut occurred. In addition to not knowing what time the haircut took place, Mr. Williams did not know how Defendant had gotten to his residence to get the haircut and did not recall when Defendant left.

The defense concluded its case by calling Defendant to testify on his own behalf. Defendant testified that in 2017 he was living with his mother near the England Air Force Base. Defendant testified that on February 22, 2017, he spent the night at Ms. Hampton's residence on Felker Street. Defendant stated when he woke up, he contacted his mother to get a ride home but she could not get him because his stepfather had the car. According to Defendant, his friend Tyler Joseph picked him up from the residence on Felker Street "early that morning" and went to Mr. Jeremy Williams's house to get a haircut. Defendant claimed his haircut took between thirty minutes to an hour, then he tried to contact his mother using a phone he borrowed from someone else at Mr. Williams's house.

According to Defendant, he had no involvement in the shooting of James Melton. He testified that he lied to law enforcement when he gave a statement the day of the shooting because he was trying to protect his cousin, Joseph Hampton.

On cross-examination, Defendant claimed that everyone, including himself, was lying on the day of the shooting when they said he was at the convenience store. He stated he knew Nicholas West but they were not friends. Defendant testified his

11

mother brought him to the Alexandria Police Department on February 23, 2017, where he gave a statement to Detective Bowens claiming that he was with his cousin Joseph Hampton walking to the store, heard a gunshot, then they saw a dead body on the way back.

Following deliberations, the jury found Defendant guilty as charged on both counts. On May 3, 2021, the trial court sentenced Defendant to life imprisonment at hard labor with the possibility of parole after twenty-five years for the second degree murder of James Melton. Furthermore, the trial court sentenced Defendant to forty-five years at hard labor without the benefit of probation, parole, or suspension of sentence, for the attempted armed robbery of James Melton as well as an additional five years at hard labor without benefits pursuant to the firearm enhancement under La.R.S. 14:64.3. The trial court ordered that the forty-five year sentence and the five-year sentence run consecutively to each other but concurrently to Defendant's life sentence. Prior to sentencing, Defendant filed a motion for new trial which was addressed in open court and subsequently denied.

Defendant filed a "Motion to Reconsider Sentence with Incorporated Memorandum" on June 2, 2021, arguing it was excessive to allow Defendant to have parole eligibility for second degree murder after twenty-five years but simultaneously sentence him to fifty-years at hard labor without benefits, effectively denying Defendant parole eligibility until after fifty years. Said motion was denied without hearing on June 3, 2021.

Defendant now appeals his convictions and sentences, asserting four assignments of error: (1) the State failed to prove his guilt beyond a reasonable doubt; (2) the trial court erred by admitting "irrelevant gruesome autopsy photographs"; (3) the trial court erred by not admitting text messages between Beatrice Papayanis and the victim; and (4) Defendant's sentence is unconstitutional because he was a minor at the time of the murder but his fifty-year combined

12

sentence for armed robbery with a firearm means he has no possibility of parole until after serving fifty years at hard labor.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent; however, the court minutes of sentencing require correction.

The sentencing transcript indicates Defendant's five-year sentence imposed pursuant to La.R.S. 14:64.3 was without the benefit of parole, probation, or suspension of sentence; however, this is not reflected in the court minutes. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court is ordered to amend the court minutes of sentencing to reflect that Defendant's five-year sentence was imposed without the benefit of parole, probation, or suspension of sentence.

## ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, Defendant contends the State failed to prove he was the individual in the dark hooded sweatshirt who attempted to rob and ultimately murdered Mr. Melton. He argues it makes more sense to conclude Mr. West killed Mr. Melton out of jealousy over the sexual relationship between Mr. Melton and Ms. Papayanis and that the testimony of Ms. Papayanis, Mr. West, Mr. Hampton, and Ms. Geraldine Hampton identifying Defendant as the shooter in the video was too incredible to be believed. The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d

559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04–1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

In the instant case, Defendant contests only the identification of himself as the shooter. The jury saw two individuals approach the victim's vehicle, one wearing a dark hooded sweatshirt and one wearing a light hooded sweatshirt. Mr. Christopher Winchester, who was eating his lunch in his vehicle across the street from the victim's truck, testified he heard a gunshot, looked up, and saw the individual in the dark sweatshirt put a gun into his pocket before both men ran away from the truck. Ms. Papayanis, Mr. West, and Mr. Hampton all identified themselves in the surveillance video and identified Defendant as the individual wearing the dark sweatshirt. Furthermore, Mr. Hampton testified that he saw Defendant shoot Mr. Melton before placing the gun back into his pocket. Finally, Ms. Geraldine Hampton, Defendant's ex-aunt by marriage, testified that Defendant was wearing dark clothes when she saw him on the morning of the shooting and further stated she was certain of her identification of Defendant based upon portions of the videos which showed the face of the individual in the dark sweatshirt.

14

On the other hand, Defendant testified he was nowhere near the convenience store at the time of the shooting, and he was lying on the day of the shooting when he gave a brief statement to law enforcement placing himself at the scene. The only evidence offered to support his version of events was his mother's testimony which only confirmed that the first time she saw Defendant on the day of the shooting was roughly two hours after the shooting and the testimony of his barber that he gave Defendant a haircut on the day of the shooting but could not give any indication as to what time that haircut took place.

As previously noted, this court cannot second guess credibility determinations of the fact finder on appeal and the testimony of a single witness is sufficient to establish guilt absent internal contradiction or irreconcilable conflict with physical testimony. While some of Ms. Papayanis's testimony is contradicted by both the video of the shooting and her subsequent 9-1-1 call, Defendant fails to articulate any internal contradiction or irreconcilable conflict in the testimony of his cousin Joseph Hampton, Nicholas West, or Mr. Hampton's mother, Geraldine Hampton. Defendant instead argues "[b]ecause the State failed to negate the reasonable hypothesis that Mr. West is the person that tried to rob and shot Mr. Melton, the State failed to exclude the reasonable hypothesis that Mr. Jackson did not murder Mr. Melton and did not try to rob Mr. Melton."

Defendant's argument is based upon the wrong analysis for insufficient evidence claims. Defendant's argument regarding a failure to negate a reasonable hypothesis is only relevant in cases based primarily upon circumstantial evidence. *See State v. Sheehan*, 558 So.2d 758 (La.App. 3 Cir.), *writ denied*, 566 So.2d 394 (La.1990). The case against Defendant was based upon first-hand testimony of multiple witnesses coupled with a video of the shooting itself. Defendant's argument is nothing more than a claim that the jury made the wrong credibility determination when it decided to accept the testimony of the prosecution's

witnesses. Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found the State carried its burden of proving Defendant's identity as the shooter beyond a reasonable doubt. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, Defendant contends the trial court committed reversible error when it allowed the State to introduce three "gratuitous and gruesome autopsy photographs" of the victim over a defense objection. The photographs in question are pictures taken after part of the victim's skull had been removed leaving his brain completely visible with a green shaft through it to indicate the trajectory of the bullet recovered from his brain. Defendant contends that because there was no question that the individual in the dark sweatshirt killed the victim and his defense was that he was not said individual because he was not on that side of town, there was no need to introduce the photographs showing the trajectory of the bullet. Accordingly, Defendant contends any probative value of the "photographs was substantially outweighed by their potential to prejudice the jury."

As noted by Defendant in brief, the supreme court reviewed the issue of gruesome autopsy photographs in *State v. Broaden*, 99-2124, pp. 22-25 (La. 2/21/01), 780 So.2d 349, 364, *cert. denied*, 534 U.S. 884, 122 S.Ct. 192 (2001):

> Defendant complains of the admission of three gruesome photographs. Defendant argues that as both victims would have died from bullets fired by Adams, the probative value of this evidence is slight and was introduced solely to inflame jurors and incite them to convict based on the pictures. Objections were raised before trial.

> The state is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds and to provide positive identification of the victim. *State v. Koon*, 96–1208, p. 34 (La.5/20/97), 704 So.2d 756, 776; *State v. Martin*, 93–0285, p. 14 (La.10/17/94), 645 So.2d 190, 198. Photographic evidence will be admitted unless it is so gruesome as to overwhelm jurors' reason and lead them to convict without sufficient other evidence. *Koon*, 96–1208 at p. 34, 704 So.2d at

16

776, citing *State v. Perry,* 502 So.2d 543, 558–59 (La.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).

We agree that the photographs are indeed gruesome. This court regularly sees claims of "gruesome" photographs in capital cases, but has reversed only once on these grounds in any case. *State v. Morris,* 245 La. 175, 157 So.2d 728 (1963) (gratuitous introduction of "gruesome and ghastly" photographs depicting the progress of an autopsy in an "increasing grotesque and revolting" manner constituted reversible error when the defendant admitted that he killed the victim and contested only his state of mind). Admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." *Martin,* 93–0285 at pp. 14–15, 645 So.2d at 198. *Cf., State v. Wessinger,* 98–1234, pp 16–17 (La.5/28/99), 736 So.2d 162, 179 (photographic evidence "will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict defendant absent other sufficient evidence.")

We do not find any reason to treat photographic evidence differently than any other evidence, which is admissible if relevant and more probative than prejudicial. La.Code Evid. art. 403. At any rate, we find that the admission of the disputed photographs in this case was gratuitous. The pathologist could have given verbatim testimony illustrated by other, less graphic photos. While the state is certainly entitled to the moral force of its evidence, that evidence should enlighten rather than bludgeon the jury. The photographs taken at the crime scenes were sufficient to demonstrate the cause of death as well as the location of the gunshot wounds. However, we do not find reversible error.

In the instant case, while Defendant contends his defense was simply that "he was not the shooter," that argument was buttressed with his contention, explicitly stated in Defendant's first assignment of error, that it made more sense for Mr. West to have killed Mr. Melton. The State negated this contention by having multiple witnesses identify Mr. West as the individual who was standing away from the vehicle with his back to the truck when the shooting occurred. The photographs showing the bullet was fired from behind and slightly to the left of the victim helped establish the shooter could not have been the individual in the light sweatshirt, identified as Mr. West.

"The trial court has considerable discretion in the admission of photographs, and its ruling will not be disturbed in the absence of an abuse of that discretion."

17

*State v. Critton*, 52,058, p. 9 (La.App. 2 Cir. 8/22/18), 251 So.3d 1281, 1289, *writ denied*, 18-1515 (La. 2/25/19), 266 So.3d 292. As noted, the photographs had probative value in proving the individual identified as Mr. West could not have been the shooter, contrary to Defendant's contention Mr. West was the more logical shooter. Therefore we cannot say the trial court abused its discretion in admitting the three photographs in question.

## ASSIGNMENT OF ERROR NO. 3

In his third assignment of error, Defendant contends the trial court abused its discretion when it excluded text messages between Ms. Papayanis and Mr. Melton that he sought to introduce to show there was conflict between Ms. Papayanis and Mr. Melton. The trial court excluded the messages on the grounds they were irrelevant. Defendant contends the messages would have supported the "reasonable theory of [Defendant's] innocence, that Ms. Papayanis, Mr. West, and Mr. Hampton conspired to rob Mr. Melton and to frame Mr. Jackson for Mr. Melton's murder when the robbery went wrong." Defendant is again confusing the standard of review in this case based heavily upon direct evidence with the standard of review for a circumstantial evidence case.

Under La.Code Evid. art. 402, "Evidence which is not relevant is not admissible." Furthermore, relevant evidence is defined in La.Code Evid. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." As previously noted by the supreme court, "In determining the relevance of evidence, much discretion is afforded to the trial judge." *State v. Stowe*, 635 So.2d 168, 173 (La.1994). We cannot say the trial court abused its discretion in finding the evidence irrelevant.

As Defendant states repeatedly in his brief to this court, his defense was that he was not the person that shot Mr. Melton. The evidence he contends should have

18

been admitted had no bearing on the issue of who was the individual in the dark sweatshirt.

## ASSIGNMENT OF ERROR NO. 4

In his final assignment of error, Defendant contends his sentences for attempted armed robbery and the accompanying firearm enhancement were excessive and violated La.R.S. 15:574.4(J). In particular, Defendant contends his sentences for said offenses should be amended to allow for parole eligibility after twenty-five years. Additionally, he argues that La.R.S. 15:574.4(J) applies to his sentences for attempted armed robbery and the firearm enhancement and entitle him to parole eligibility after twenty-five years assuming he meets the additional requirements listed in the statute.

Under La.Code Crim.P. art. 881.1(E), a defendant may only base a claim of excessiveness on appeal upon those grounds which were raised in his motion to reconsider sentence. In the motion to reconsider, Defendant argued that his sentences for attempted armed robbery and the accompanying firearm enhancement should have been no more than twenty years plus five years so that he would finish serving those sentences by the time he was eligible for parole on his life sentence. In his appellate brief, Defendant does not ask this court to limit his sentences for attempted armed robbery and the firearm enhancement to twenty-five years combined. He asks this court to amend the current sentences to include parole eligibility. Defendant failed to raise the argument presented in his brief in his motion to reconsider sentence. He cannot now raise this argument regarding the applicability of La.R.S. 15:574.4(J) on appeal.

In his appellate brief, Defendant asserts even if this court finds La.R.S. 15:574.4(J) does not apply, it should still amend his sentences on the attempted armed robbery conviction and firearm enhancement to allow for parole eligibility because the sentences are excessive. As Defendant asserts in his appellate brief and

19

in the motion to reconsider that his sentences for attempted armed robbery and the firearm enhancement are excessive, albeit on different grounds, he is entitled to a bare claim of excessiveness review. *State v. Pyke*, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713.

Louisiana courts have laid out the following guidelines with regard to excessive sentence review:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

>> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

> Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

>> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is

within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958[, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615 (1996)].

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-07, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

Furthermore, in *State v. Baker*, 06-1218 (La.App. 3 Cir. 4/18/07), 956 So.2d 83, *writ denied*, 07-320 (La. 11/9/07), 967 So.2d 496, and *writ denied*, 07-1116 (La. 12/7/07), 969 So.2d 626, this court adopted the fifth circuit's three factor test from *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, which established that an appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes.

Regarding the nature of the crimes, Defendant was convicted of attempted armed robbery and attempted armed robbery with a firearm, both defined as crimes of violence in La.R.S. 14:2. Furthermore, the instant case involves an attempted armed robbery that escalated into a second degree murder in the span of ten seconds. Defendant's sentence of forty-five years for attempted armed robbery is close to the maximum possible sentence of forty-nine and a half years under La.R.S. 14:27 and 14:64. The five-year sentence on the firearm enhancement is mandatory under La.R.S. 14:64.3(B).

We next consider the nature and background of the offender. At the time of the offense, Defendant was seventeen years old. He testified he completed tenth grade in school. The trial court noted the following at sentencing, "While incarcerated [Defendant] had been charged with several jailhouse incidents of multiple simple batteries, battery on an officer, an escape, marijuana in a correctional

21

facility." The only mitigating factors acknowledged by the trial court were Defendant's youth and his lack of prior criminal history.

Finally, Defendant references sentences imposed in similar cases. In *State v. Allen*, 40,972 (La.App. 2 Cir. 5/17/06), 930 So.2d 1122, *writ denied*, 08-507 (La. 11/26/08), 997 So.2d 543, the second circuit upheld a sentence of thirty-five years for armed robbery despite the defendant getting a lesser sentence for attempted first degree murder. Similarly, the fifth circuit in *State v. Robicheaux*, 03-1063 (La.App. 5 Cir. 12/30/03), 865 So.2d 149, *writ denied*, 04-381 (La. 6/25/04), 876 So.2d 830, upheld a maximum sentence for armed robbery for a defendant, running concurrently to a fifty-year sentence for attempted second degree murder, where the defendant had used a firearm which was discharged during attempted robbery. Although the defendant in *Robicheaux* had a prior history of violent offenses, we note Defendant herein did not just fire a gun during the incident, he shot Mr. Melton in the back of the head, brutally killing him.

In light of the above, we find no merit in Defendant's argument that his sentence was excessive.

## DECREE

For the foregoing reasons, Defendant's convictions and sentences are affirmed. The trial court is ordered to amend the court minutes of sentencing to reflect that Defendant's five-year sentence was imposed without the benefit of parole, probation, or suspension of sentence.

**AFFIRMED.**